UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| YREKA WESTERN RAILROAD COMPANY, | NO. CIV. 2:11-1868 WBS CMK |
| Plaintiff, | |
| v. | ORDER RE: MOTION FOR PRELIMINARY INJUNCTION |
| EDWARD A. TAVARES, ROSEMARY T. TAVARES, PLM LENDER SERVICES, INC., | |
| Defendants. / | |

----oo0oo----

Plaintiff Yreka Western Railroad Company filed this action against defendants Edward A. Tavares, Rosemary T. Tavares, and PLM Lender Services, Inc., seeking to enjoin the foreclosure of plaintiff's property.  Plaintiff now moves for a preliminary injunction to enjoin foreclosure pending a determination by the Surface Transportation Board ("STB") regarding abandonment.

I.  <u>Procedural and Factual Background</u>

Plaintiff is a rail common carrier in Siskiyou County,

1

1  California.  (Hammond Decl. ¶¶ 1-2 (Docket No. 49).)  Plaintiff
2  owns real property at 300 East Miner Street in Yreka, California,
3  which includes rail lines, a depot, office space, a loading dock,
4  and a work shop.  (Id. ¶ 3.)  On April 11, 2007, plaintiff
5  executed a promissory note in the amount of $175,000.00, secured
6  by real and personal property.  (Id. ¶ 6.)  The property consists
7  of approximately 4.3 acres that is located at the end of
8  plaintiff's approximately nine miles of track running from
9  Montague to Yreka.  (Cogan Aff. ¶ 15 (Docket No. 50).)  The Deed
10 of Trust securing the note specifically exempts the railroad
11 track easement that lies within the boundaries of plaintiff's
12 real property.  (Tavares Decl. Ex. B at 14 (Docket No. 63).)  The
13 real property includes the depot, office space, loading dock, and
14 work shop.  (Hammond Decl. ¶ 3.)  The Deed of Trust also
15 describes an interest in personal property, (Compl. Ex. C
16 ("Notice of Default"), Ex. A (Docket No. 2-1)), which plaintiff
17 contends would include all the accounts, furniture, office
18 equipment, supplies, and materials currently owned and stored by
19 plaintiff at the subject property, (Hammond Decl. ¶ 12).

20         Edward A. Tavares and Rosemary T. Tavares currently
21 hold the interest in the Note and Deed of Trust.  (Id. ¶ 8.)  In
22 April of 2011, PLM Lender Services, Inc., recorded a Notice of
23 Default and Election to Sell with respect to plaintiff's real and
24 personal property.  (Id. ¶ 10.)  On November 17, 2011, the
25 parties entered into a Settlement Agreement under which plaintiff
26 released a $25,000 bond to defendants and made an additional
27 $25,000 payment.  (Cogan Aff. ¶ 3.)  Defendants extended the
28 deadline for plaintiff to pay an additional $177,500 under the

Settlement Agreement, however plaintiff was unable to do so and defendants elected to proceed with the sale of the property. (Id. ¶ 4.)

Plaintiff does not dispute defendants' ability to foreclose but argues that defendants are required to petition the STB for abandonment before foreclosing. No goods have passed over plaintiff's rail lines since August 2008, however plaintiff argues that it has not abandoned or withdrawn services and has been participating in proceedings before the STB to require the Central Oregon & Pacific Railroad, Inc. to restore connecting services to plaintiff's line. (Hammond Decl. ¶ 16.) Plaintiff argues that without the property securing the note, it will be unable to carry on its business and would be forced to abandon rail services in Siskiyou County. (P. & A. in Supp. of Prelim. Inj. at 4:7-10 (Docket No. 59-1).) Plaintiff argues that a shop, engine house, tools, and equipment are needed to inspect and maintain the railroad lines and that a permanent location is needed to store this equipment. (Hammond Decl. ("Hammond Decl. II") ¶¶ 10-11 (Docket No. 64-1).)

Defendants argue that plaintiff has already listed the subject property, including the offices and depot, for sale, suggesting that STB approval is not needed for such a sale and that the buildings are not necessary to plaintiff's operations. (Tavares Decl. ¶ 8, Ex. F.) Plaintiff represents that the property is no longer listed for sale and that any sale would have included terms and conditions that would have ensured the continued existence and operations of the railroad. (Hammond Decl. II ¶ 9.) Plaintiff additionally submits a Letter of Intent

3

for Purchase that represents that plaintiff has a sale pending for the entire railroad and that escrow is anticipated to close on June 15, 2012.[1]  (Cogan Aff. ¶ 4, Ex. A.)

The BSA has previously authorized abandonment by plaintiff of its entire 8.9 miles of rail line.  See <u>Yreka Western Railroad Company-Abandonment Exemption-In Siskiyou County, Cal.</u>, STB Finance Docket No. AB-246 (May 4, 1999).  Plaintiff did not consummate the abandonment, however, and the authorization expired after one year.

## II. Judicial Notice

A court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  The court may take judicial notice of matters of public record or of documents whose contents are alleged in the complaint and whose authenticity is not questioned.  <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688-89 (9th Cir. 2001).

Defendants request that the court judicially notice four documents: (1) a copy of the Subordination Agreement recorded February 27, 2006, in Siskiyou County; (2) a copy of the Order from the STB dated February 23, 2000, in Colorado Central

---

[1] Defendants argue that this is actually a sham sale because the buyer, Michael Knapp, shares the same last name as John Knapp, who serves on the Board of Directors of the Rocky Mountain Railway and Mining Museum, which is the majority shareholder in Yreka Western Railroad. (Opp'n to Mot. for Prelim. Inj. at 6:16-21 (Docket No. 62).)  John Knapp submitted a declaration stating that Michael Knapp is not related to him in any manner.  (Knapp Decl. ¶ 2 (Docket No. 57).)

4

Railroad Company -- Operation Exemption -- Yreka Western Railroad Company; (3) a copy of the Petition for Leave to Withdraw from Proceeding of Yreka Western Railroad filed with the STB, Finance Docket No. 35175 on January 14, 2010; and (4) a copy of the Reply to Petition for Leave to Withdraw from Proceeding of Shipper Petitioners filed with the STB, Finance Docket No. 35175 on February 3, 2010.  Plaintiff additionally requests that the court judicially notice three decisions by the STB.  (Docket No. 64-3.)

The court will take judicial notice of defendants' first exhibit because it is a matter of public record whose accuracy cannot be questioned.  See Lee, 250 F.3d at 689.  For the remaining requests, to the extent that the parties request that the court take judicial notice of the existence of the filings before the STB and its decisions, the request is granted.  See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank, 136 F.3d 1360, 1364 (9th Cir. 1998).  However, the court will not take judicial notice of any disputed facts contained in the filings or opinions.  See Lee, 250 F.3d at 690.

III.  Discussion

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  As the Supreme Court has repeatedly recognized, injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."

1  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A
2  Wright, Miller, & Kane, Federal Practice and Procedure § 2948, at
3  129-30 (2d ed. 1995)); see Winter, 555 U.S. at 22.
4       After Winter, the Ninth Circuit has held that a
5  preliminary injunction may be appropriate where a plaintiff
6  demonstrates "that serious questions going to the merits were
7  raised and the balance of hardships tips sharply in the
8  plaintiff's favor," provided that the plaintiff also satisfies
9  the other two Winter factors (public interest and irreparable
10 harm).  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127,
11 1134-35 (9th Cir. 2011).
12     A.   Merits
13       The jurisdiction of the Surface Transportation Board
14 ("STB") over transportation by rail carriers, including the
15 abandonment of rail facilities, is exclusive, and remedies under
16 the Interstate Commerce Commission Termination Act, 49 U.S.C. §§
17 10501-11908, are extensive and preempt remedies provided under
18 federal or state law.  See 49 U.S.C. § 10501; CSX Transp., Inc.
19 v. Ga. Pub. Serv. Comm'n, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996)
20 (noting that "[i]t is difficult to imagine a broader statement of
21 Congress' intent to preempt state regulatory authority over
22 railroad operations" than that contained in 49 U.S.C.
23 § 10501(b)).  Under 49 U.S.C. § 10901(a)(4), a non-rail carrier
24 cannot acquire a railroad line without the STB's authorization.
25 The statute specifically states that "in the case of a person
26 other than a rail carrier, [a person may] acquire a railroad line
27 . . . only if the Board issues a certificate authorizing such
28 activity . . . ."  49 U.S.C. § 10901(a)(4); see Heartland Bus.

1  Bank v. Escanaba & Lake Super. Ry. Co., No. 2:09-cv-243, 2010 WL
2  2539657, at *2 (W.D. Mich. June 15, 2010).
3       If foreclosure of a rail carrier's property will result
4  in abandonment of the railway, under 49 U.S.C. § 10903(a)(1) the
5  parties must petition the STB before proceeding.
6  See Stewartstown R.R. Co.--Adverse Abandonment--In York Cnty.,
7  Pa., STB Docket No. AB 1071, at *1 (July 22, 2011) (third party
8  sought abandonment so that it could facilitate the sale of rail
9  carrier's property or foreclose upon rail carrier's assets).
10 Abandonment will be allowed only if the STB finds that "the
11 present or future public convenience and necessity require or
12 permit the abandonment."  49 U.S.C. § 10903(d).
13      When someone other than a rail carrier applies to the
14 STB for abandonment of a rail line, the process is known as
15 "adverse abandonment."  Howard v. Surface Transp. Bd., 389 F.3d
16 259, 261 (1st Cir. 2004).  "By granting a third party [adverse
17 abandonment] application, the Board withdraws its primary
18 jurisdiction over the [rail] line" and allows "[q]uestions of the
19 disposition of the line, including the adjudication of various
20 claims of ownership or other rights and obligations, [to be] left
21 to state or local authorities."  N.Y.C. Econ. Dev. Corp. --
22 Adverse Abandonment -- N.Y. Cross Harbor R.R., Inc., Docket No.
23 AB 596 2001 WL 1637916, at *1 (STB served Dec. 21, 2001),
24 overruled on other grounds by N.Y. Cross Harbor R.R. v. Surface
25 Transp. Bd., 374 F.3d 1177 (D.C. Cir. 2004).
26      Defendants argue that since the Deed of Trust exempts
27 the physical rail line, they are not subject to the STB's
28 jurisdiction because they are not acquiring a railroad line under

7

1  § 10901(a)(4) or abandoning a rail line under § 10903. They
2  argue that plaintiff's motion to enjoin the foreclosure sale
3  pending a decision by the STB is merely a stall tactic so that
4  plaintiff can complete the sale of the property. (Opp'n to Mot.
5  for Prelim. Inj. at 7:13-15 (Docket No. 62).)

6        The parties have not presented, and this court has been
7  unable to find, any authority addressing the STB's jurisdiction
8  over foreclosure actions brought by creditors of railroad assets
9  when the assets foreclosed upon exclude the actual rail line
10 tracks.[2] The court has located a line of authority that provides
11 helpful guidance in this case. These cases address voluntary
12 agreements between rail carriers and buyers in which railroad
13 assets are sold, but the carrier retains its obligation to
14 continue providing common carrier services along the rail line
15 through the use of easements very similar to the one used in the
16 Deed of Trust in this case.

17       In <u>State of Maine, Department of Transportation --</u>
18 <u>Acquisition and Operation Exemption -- Maine Central Railroad</u>
19 <u>Co.</u>, 8 I.C.C.2d 835, 1991 WL 84430 (May 20, 1991), Maine's
20 Department of Transportation ("MDOT") sought to acquire the
21 physical assets of an active railroad carrier. The carrier

---

[2] Plaintiff argues that the STB's decision underlying the court decision in <u>New York Cross Harbor Railroad Services v. Surface Transportation Board</u>, 374 F.3d 1177 (D.C. Cir. 2004), involved eviction from leased premises and not foreclosure on the railroad lines themselves and would therefore be instructive in this case. (Reply in Supp. of Prelim. Inj. at 10:18-11:2.) However, the City landlord specifically moved the STB for adverse abandonment of the railroad lines that were on the leased property in an effort to prevent any use of the tracks by the carrier. <u>Id.</u> at 1179-80. Defendants in this case are not affirmatively seeking to prevent plaintiff from using the railroad line on the subject property.

selling the rail line intended to continue providing common carriage along the line and the parties drafted an agreement granting a permanent unconditional easement to the carrier so that it could continue to maintain and operate the line.  Even though MDOT would technically acquire ownership of the rail line tracks, the Interstate Commerce Commission[3] ("ICC") did not impose a common carrier obligation on MDOT and found that it therefore did not have jurisdiction over the transaction because the operator had "both the full right and necessary access to maintain, operate, and renew the line."  Id. at 837.

State of Maine and its progeny hold that the sale of the physical assets of a rail line does not constitute a sale of a railroad line within the meaning of § 10901 when the selling carrier: "(1) retains a permanent, exclusive freight rail operating easement giving it the right and common carrier obligation to provide freight rail service on the line, and (2) has sufficient control over the line to carry out its common carrier operations."  Santa Cruz Reg'l Transp. Comm'n -- Petition for Declaratory Order, Docket No. FD 35491, 2011 WL 3667482, at *2 (STB served Aug. 22, 2011).  "For a transaction to fall within that precedent, however, the terms of the sale must protect the seller from undue interference by the purchaser with the provision of common carrier freight rail service."  Id.

Although the STB has found that it lacks jurisdiction

---

[3] "In 1995, the Congress revised the Interstate Commerce Act, abolished the ICC, transferred the ICC's remaining regulatory authority to [the STB] and provided that ICC precedent applies to the STB."  N.Y. Cross Harbor R.R., 374 F.3d at 1179 n.2.

9

over transactions in which the common carrier retains sufficient control over the railway line, it has also stated that due to "the significant possibility that this sort of transaction could affect the carrier's ability to meet its common carrier obligations, unless there are adequate protections built into the transaction, we intend to examine these transaction closely and will make a determination based on the facts and circumstances of each case." State of Maine, 8 I.C.C.2d at 838.  The STB has accordingly asserted jurisdiction and blocked voluntary purchase agreements that did not leave the carrier free from interference and able to conduct its operations.  See Orange Cnty. Transp. Auth. -- Acquisition Exemption -- The Atchison, Topeka & Santa Fe Ry. Co., 10 I.C.C.2d 78, 1994 WL 114003 (Mar. 28, 1994); S. Pac. Transp. Co. -- Abandonment Exemption -- L.A. Cnty., 8 I.C.C.2d 495, 1992 WL 125050 (May 6, 1992).

      Defendant argues that the Deed of Trust in this case specifically excludes the railroad line and therefore the STB lacks authority to authorize this transaction under § 10901. This interpretation may be accurate insofar as "the STB has defined 'railroad line' to include not only physical railroad property but also the interstate freight transportation authority attached to the physical property," Bhd. of R.R. Signalmen v. Surface Transp. Bd., 638 F.3d 807, 812 (D.C. Cir. 2011), and the parties here never intended to include plaintiff's common carrier obligation in the property securing the loan.  The State of Maine and subsequent cases establish, however, that the proper inquiry is not the parties' intent in the transaction, but whether the practical result of the transaction would overly burden the

10

ability of the carrier to fulfill its common carrier obligations. The same analysis applies in this case.

Although plaintiff's claim is premised on the idea that defendants must seek abandonment of the rail line under § 10903(a)(1) in order to acquire the property, the claim is really about whether the acquisition of plaintiff's property will interfere with plaintiff's ability to provide rail services over the line, effectively forcing plaintiff to abandon the rail line. To this end, plaintiff has submitted evidence suggesting that its operations will be severely constrained if it loses its equipment, loading docks, depot, and storage facilities. Whether the foreclosure will interfere with plaintiff's common carrier obligations therefore requires a similar analysis to the STB's determination in State of Maine.[4]

Defendants have pointed to no case where a court, rather than the STB, was the first to decide whether an acquisition by a non-railroad carrier would interfere with a common carrier's ability to provide rail services over the line. "[A]n analysis of relevant authority shows that it has long been the practice, where such interests are to be transferred, for

---

[4] Defendants further argue that plaintiff has already ceased operations over the rail line and no longer uses the depot to load passengers or goods. This effective abandonment argument implies that foreclosure upon plaintiff's property will not interfere with plaintiff's operations because there currently are no operations. Setting aside for the moment plaintiff's argument that it is still required to regularly maintain the tracks, (Reply in Supp. of Mot. for Prelim. Inj. at 7:26-28), the court notes that a rail line is not considered abandoned absent an STB decision authorizing such abandonment. See Union Pac. R.R. Co. - - Abandonment Exemption -- In Rio Grande & Mineral Counties, Co., Docket No. AB-33 (STB served May 24, 2000) (finding that STB authorization was required prior to abandonment determination where rail line had not been used for thirty years).

11

such proposals to be 'submitted to [the STB] in advance, together with a copy of the agreement between the railroad and the entity acquiring its right-of-way, for a jurisdiction determination.'" Buffalo Crushed Stone, Inc. v. R.J. Corman R.R. Corp., No. 97-CV-0875E(SR), 2001 WL 392075, at *4 (W.D.N.Y. Apr. 10, 2001). Given the STB's vast and unique experience in dealing with such matters, it is far better suited than any court to uniformly apply national rail policy and determine whether the proposed foreclosure will result in interference with, or abandonment of, plaintiff's railroad operations. See Pejepscot Indus. Park, Inc. v. Maine Cent. Ry. Co., 215 F.3d 195, 205-06 (1st Cir. 2000); Buffalo Crushed Stone, 2001 WL 329075, at *4. Accordingly, the court finds that there are "serious questions going to the merits" of plaintiff's claim.[5]

B. <u>Irreparable Harm</u>

Even if the probability of success on the merits is high, the moving party must still "demonstrate a significant threat of irreparable injury." Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc., 762 F.2d 1374, 1376 (9th Cir. 1985). A plaintiff suffers irreparable injury "when the court would be

---

[5] The court does not find, however, that defendants' only option in front of the STB would be to apply for abandonment of the rail line. Defendants could file a notice seeking exemption under 49 U.S.C. § 10502 from the statutory requirement that a "person other than a rail carrier" obtain a certification of authorization in order to "acquire a railroad line," 49 U.S.C. § 10901(a)(4), and at the same time file a motion to dismiss the notice on the ground that neither authorization nor exemption is required because the assets do not constitute a "railroad line." See Bhd. of R.R. Signalmen, 638 F.3d at 810. Alternatively, defendants could file a declaratory action in front of the STB that the foreclosure is not an abandonment or an acquisition of a railroad line. See Santa Cruz Reg'l Transp. Comm'n, 2011 WL 3667482.

12

unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 269 F.3d 1149, 1156 (9th Cir. 2001). "Mere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation." Goldie's Bookstore, Inc. v. Superior Court, 739 F.2d 466, 471 (9th Cir. 1984). Plaintiff therefore must demonstrate "that irreparable harm is <u>likely</u> in the absence of an injunction." Winter, 555 U.S. at 20.

If the injunction is not granted, plaintiff faces the risk that its real and personal property will be sold in a foreclosure sale. The loss of property is often considered an irreparable loss because of the unique nature of real property. Avila v. Stearns Lending, Inc., No. Civ. 08-0419-AG(CTx), 2008 WL 1378231, at *3 (C.D. Cal. Apr. 7, 2008). Accordingly, plaintiff has demonstrated the risk of irreparable loss.

    C.    <u>Balance of Equities</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter, 129 S. Ct. at 376. "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 542 (1987). Defendants argue that they will be injured by an injunction because the size of plaintiff's debt grows larger every day while the value of the property shrinks. (Opp'n to Mot. for Prelim. Inj. at 7:17-18.) Defendants therefore conclude that they "will be lucky to be able

to sell the Property for what they are owed on this Note today and will surely not be able to recoup the amount owned [sic] on the Note if the sale is delayed another 6 months to a year that it will take to get this matter to Trial." (Id. at 7:19-21.)

Plaintiff argues that defendants will not be harmed by an injunction because the value of its debt to defendants is currently accruing at an interest rate of either 18% or 22%. (P. & A. in Supp. of Prelim. Inj. at 2:9-11 (18%); Reply P. & A. in Supp. of Prelim. Inj. at 4:14-16 (22%).) Given this high interest rate, defendants will suffer no harm from delay so long as the sale price of the subject property is sufficient to cover plaintiff's current debt level and any additional interest and costs that accrue.

Defendants present no evidence suggesting what the current market value of the property is or that the property value is likely to substantially decrease in the near future. From the evidence presented to the court, it appears that the property was recently listed for sale at a price of $729,000, and that this listing excluded equipment that is covered under the Deed of Trust. (Tavares Decl. Ex. F.) Although a listing price is not necessarily representative of the value of a property, defendants offer no evidence suggesting that the sale of the property and equipment will be insufficient to cover the approximately $300,000 due on the note.[6] Accordingly, risk of

---

[6] It is unclear precisely how much is currently due on the note. In plaintiff's counsel's affidavit filed May 2, 2012, he states that: "On May 1, 2012, Plaintiff was informed by verbal notice to Plaintiff's attorney, that the Defendants were claiming a new 'payoff amount' to avoid the foreclosure sale was approximately $332,000. On May 2, 2012, Defendants' counsel

14

loss to defendants appears to be minimal.

D.  <u>Public Interest</u>

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982). "The public interest analysis for the issuance of a preliminary injunction requires [the court] to consider 'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'" <u>Indep. Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly</u>, 572 F.3d 644, 659 (9th Cir. 2009) (quoting <u>Hybritech Inc. v. Abbott Lab.</u>, 849 F.2d 1446, 1458 (Fed. Cir. 1988)).  This determination "addresses the impact on nonparties rather than parties." <u>Sammartano v. First Judicial Dist. Court</u>, 303 F.3d 959, 974 (9th Cir. 2002).

The STB has a "'statutory duty to preserve and promote continued rail service,' and, specifically in the context of the 'abandonments or discontinuance of rail service,' . . . one of its 'function[s] . . . is to provide the public with a degree of protection against the unnecessary discontinuance, cessation, interruption, or obstruction of available rail service.'" <u>N.Y. Cross Harbor R.R.</u>, 374 F.3d at 1187-88 (quoting <u>W. Stock Show Ass'n -- Abandonment Exemption -- In Denver, Co.</u>, 1 S.T.B. 113, 1996 WL 366394, at *12 (June 12, 1996); <u>Waterloo Ry. Co. -- Adverse Abandonment -- Lines of Bangor & Aroostook R.R. Co.</u>, STB Docket No. AB-124, 2004 WL 941227, at *3 (STB served May 3,

---

indicated that the amount according to his calculations may be closer to $260,000." (Cogan Aff. ¶ 10 (Docket No. 50).)

15

2004)) (second and third alterations in original)). "Whether . . . any particular carrier should go out of business is a matter of public interest." In re Boston Terminal Co., 71 F. Supp. 472, 473 (D. Mass. 1947). An injunction preventing defendants from foreclosing upon plaintiff's property without a determination by the STB of whether plaintiff would retain the ability to act as a common carrier is therefore in the public's interest.

  E. Bond

    Federal Rule of Civil Procedure 65(c) provides that the court may require the posting of a security bond "[i]n an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 56(c). Defendants move the court to require plaintiff to file a bond in addition to the $15,000 bond that it has already filed pursuant to the court's grant of a temporary restraining order. Defendants represent that they have already incurred over $25,000 in attorneys' fees on this matter and they estimate that attorneys' fees to get this case to trial would exceed $75,000. (Opp'n to Mot. for Prelim. Inj. at 8:14-18.) Plaintiff states that it is unable to pay a bond in addition to the $15,000 bond that it has already posted.

    Plaintiff's sole cause of action is to enjoin defendants from foreclosing on the property until they seek authorization from the STB. The parties estimate that a decision by the STB would likely result in a 5 month to one year delay, during which period defendants will continue to earn 22% interest on the note. The additional accrued interest on the approximately $300,000 note will not be unsecured, rather it is

16

1 secured by the subject property, which the evidence suggests may
2 be worth over $700,000.  Defendants' claim that their costs from
3 delay are not secured is therefore not supported by the evidence.
4 Accordingly, the court will require no bond in addition to the
5 $15,000 bond that plaintiff has already posted.
6      IT IS THEREFORE ORDERED that plaintiff's motion for
7 preliminary injunction be, and the same hereby is, GRANTED.
8 Pending trial and further proceedings in this court, defendants
9 are hereby enjoined from selling plaintiff's real property at 300
10 East Miner Street, Yreka, California, namely, Siskiyou County
11 Assessor's Parcels (APN #'s 054-191-360, -380, and -490) as well
12 as from selling plaintiff's personal property without first
13 seeking and obtaining approval of the Surface Transportation
14 Board.
15      A Status (Pretrial Scheduling) Conference is set for
16 July 9, 2012, at 2:00 p.m. in Courtroom No. 5.  The parties shall
17 refer to the court's Order Re: Status (Pretrial Scheduling)
18 Conference, (Docket No. 3), for the required provisions of their
19 Joint Status Report.
20 DATE:   June 4, 2012

                    _____
                    WILLIAM B. SHUBB
                    UNITED STATES DISTRICT JUDGE